[Civ. No. 67746. Second Dist., Div. Seven. Dec. 1, 1983.]

CLINT EASTWOOD, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
NATIONAL ENQUIRER, INC., Real Party in Interest.

## Counsel

Gang, Tyre & Brown, Robin Russell and Howard King for Petitioner.

No appearance for Respondent.

Williams & Connolly, Irving Younger, Richard M. Cooper, F. Lane Heard III, Irell & Manella, Richard H. Borow and Jonathan H. Steinberg for Real Party in Interest.

## Opinion

THOMPSON, J.— ■ ■ ■ ■ In this proceeding in mandate,[1] we inquire into the propriety of the respondent court's ruling sustaining without leave to amend the general demurrer of the real party in interest, National Enquirer, Inc. (Enquirer), to the second cause of action of the complaint of petitioner, Clint Eastwood (Eastwood), for commercial appropriation of the right of publicity. We consider whether the unauthorized use of a celebrity's name, photograph, or likeness on the cover of a publication and in related telecast advertisements, in connection with a published nondefamatory article, which is false but presented as true, constitutes an actionable infringement of that person's right of publicity under both the common law and Civil Code section 3344, subdivision (a). We have determined that such use constitutes commercial exploitation and is not privileged or protected by constitutional considerations or expressly exempted as a news account under Civil Code section 3344, subdivision (d). Accordingly, we have concluded that the respondent court improperly sustained the general demurrer to the second cause of action without leave to amend.

### Facts and Proceedings Below

The facts before this court as set forth in the petition of Eastwood and the return of the Enquirer are not in substantial dispute.

Eastwood, a well-known motion picture actor, filed a complaint containing two causes of action against the Enquirer. The gist of the first cause of action is for false light invasion of privacy. The second cause of action is for invasion of privacy through the commercial appropriation of name, pho-

---

[1]Plaintiff seeks mandate from us to compel the trial court to set aside its order sustaining defendant's demurrer to the second cause of action without leave to amend. Under the circumstances of this case, we find that mandamus is available as a remedy. (See *Coulter v. Superior Court* (1978) 21 Cal.3d 144, 148 [145 Cal.Rptr. 534, 577 P.2d 669].)

tograph and likeness under both the common law and Civil Code section 3344.

The following pertinent facts emerge from the allegations of the first cause of action. The Enquirer publishes a weekly newspaper known as the "National Enquirer" which enjoys wide circulation and is read by a great number of people. In its April 13, 1982, edition of the National Enquirer, the Enquirer published a 600-word article about Eastwood's romantic involvement with two other celebrities, singer Tanya Tucker and actress Sondra Locke. On the cover of this edition appeared the pictures of Eastwood and Tucker above the caption "Clint Eastwood in Love Triangle with Tanya Tucker."[2]

The article is headlined "Clint Eastwood in Love Triangle" and appears on page 48 of this edition. Eastwood alleges the article is false and in this regard alleges:

"(a) The offending article falsely states that Eastwood 'loves' Tucker and that Tucker means a lot to him.

"(b) The offending article falsely states that Eastwood was, in late February, 1982, swept off his feet and immediately smitten by Tucker; that Tucker makes his head spin; that Tucker used her charms to get what she wanted from Eastwood; and that Eastwood now daydreams about their supposedly enchanted evenings together.

"(c) The offending article falsely states that Eastwood and Tucker, in late February, 1982, shared 10 fun-filled romantic evenings together; were constantly, during that period, in each other's arms; publicly 'cuddled' and publicly gazed romantically at one another; and publicly kissed and hugged.

"(d) The offending article falsely states that Eastwood is locked in a romantic triangle involving Tucker and Sondra Locke ('Locke'); is torn between Locke and Tucker; can't decide between Locke and Tucker; is involved in a romantic tug-of-war involving Locke and Tucker; that Locke and Tucker are dueling over him; that Tucker is battling Locke for his affections; and that when he is with Locke, Tucker is constantly on his mind.

"(e) The offending article falsely states that, in or about late February of 1982, there were serious problems in Eastwood's relationship with Locke;

---

[2]Copies of the cover of this publication and the subject article are attached in the appendix to this opinion.

that he and Locke at that time had a huge argument over marriage; that he and Locke had a nasty fight; and that Locke stormed out of his presence.

"(f) The offending article falsely states that after his supposed romantic interlude with Tucker, Locke camped at his doorstep and, while on hands and knees, begged Eastwood to 'keep her', vowing that she wouldn't pressure him into marriage; but that Eastwood acted oblivious to her pleas."

Eastwood further asserts that Enquirer "published the offending article maliciously, willfully and wrongfully, with the intent to injure and disgrace Eastwood, either knowing that the statements therein contained were false or with reckless disregard of . . . their . . . falsity." Enquirer used Eastwood's name and photograph without his consent or permission. As a consequence thereof, Eastwood alleges that he has suffered mental anguish and emotional distress and seeks both compensatory and punitive damages.

The second cause of action of the complaint incorporates all the allegations of the first cause of action concerning the status of Enquirer and the falsity of the article. It does not, however, incorporate the allegation that the article was published with knowledge or in reckless disregard of its falsity.

Additionally, Eastwood alleges that the Enquirer made a telecast advertisement in which it featured Eastwood's name and photograph and mentioned prominently the subject article. Moreover, Eastwood alleges that the telecast advertisements as well as the cover of the April 13 publication were calculated to promote the sales of the Enquirer. Eastwood asserts that the unauthorized use of his name and photograph has damaged him in his right to control the commercial exploitation of his name, photograph and likeness, in addition to injuring his feelings and privacy. Eastwood seeks damages under both the common law and Civil Code section 3344.

Enquirer did not challenge the legal sufficiency of the first cause of action for invasion of privacy by placing Eastwood in a false light in the public eye.

Enquirer demurred to the second cause of action for invasion of privacy through appropriation of name, photograph and likeness on the basis it failed to state a cause of action on two grounds: (1) Eastwood's name and photograph were not used to imply an indorsement of the Enquirer; and (2) Eastwood's name and photograph were used in connection with a news account.

The respondent court sustained the general demurrer of Enquirer without leave to amend, and this petition followed.[3] We granted an alternative writ.

## Issues

This petition poses two basic issues: (1) Has Eastwood stated a cause of action for commercial appropriation of the right of publicity under either the common law or Civil Code section 3344? (2) Is the conduct of the Enquirer privileged so as not to constitute an infringement of Eastwood's right of publicity?

## Discussion

In order to put the issues raised by these proceedings into proper focus, we consider first the framework of Eastwood's complaint against the Enquirer.

California has long recognized a common law right of privacy [4] (see, e.g., *Melvin* v. *Reid* (1931) 112 Cal.App. 285 [297 P. 91]), which provides protection against four distinct categories of invasion (see *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35, fn. 16 [81 Cal.Rptr. 360, 459 P.2d 912]). These four distinct torts identified by Dean Prosser[5] and grouped under the privacy rubric are: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; and (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness. (See *Lugosi* v. *Universal Pictures* (1979) 25 Cal.3d 813, 819 [160 Cal.Rptr. 323, 603 P.2d 425, 10 A.L.R.4th 1150]; Weinstein, *Commercial Appropriation of Name or Likeness: Section 3344 and the Common Law* (1977) 52 L.A. Bar J. 430; Note, *Commercial Appropriation of an Individual's Name, Photograph or Likeness: A New Remedy For Californians* (1972) 3 Pacific L.J. 651, 655-656.)

Moreover, the fourth category of invasion of privacy, namely, appropriation, "has been *complemented* legislatively by Civil Code section

---

[3]The record is silent on the specific grounds upon which the respondent court's ruling is based. (See Code Civ. Proc., § 472d.) However, both the petition and the return of Enquirer are in substantial agreement that the court based its ruling on the two grounds urged by the Enquirer. It is assumed, arguendo, that these are the grounds for the ruling. (See *Clyne* v. *Clyne* (1964) 228 Cal.App.2d 597, 598, fn. 1 [39 Cal.Rptr. 677].)

[4]First generated in an article by Samuel Warren and Louis Brandeis (Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193).

[5]Prosser, *Privacy* (1960) 48 Cal.L.Rev. 383, 384.

3344, adopted in 1971." (*Lugosi* v. *Universal Pictures, supra,* 25 Cal.3d at p. 819, fn. 6.)[6] (Italics added.)

Civil Code section 3344, subdivision (a), provides in pertinent part as follows: "Any person who knowingly uses another's name, photograph, or likeness, in any manner, for purposes of advertising products, merchandise, goods, or services, or for purposes of solicitation of purchases of products . . . without such person's prior consent . . . shall be liable for any damages sustained by the person . . . injured as a result thereof."

Eastwood has framed his complaint against Enquirer on the third and fourth branches of the right of privacy. His first cause of action, which is not at issue here, rests on the theory that the subject publication placed him in a false light in the public eye. The focus of this tort is the falsity of the published article. His second cause of action, which is at issue here, rests on alternative theories. One is the common law action of commercial appropriation. The other is the statutory remedy provided in Civil Code section 3344, subdivision (a), for the knowing use, without consent, of another's name, photograph or likeness for the purposes of advertising or solicitation of purchases.

■ A common law cause of action for appropriation of name or likeness may be pleaded by alleging (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. (See Prosser, Law of Torts (4th ed. 1971) § 117, pp. 804-807; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 606, p. 2244.)

In addition, to plead the statutory remedy provided in Civil Code section 3344, there must also be an allegation of a knowing use of the plaintiff's name, photograph or likeness for purposes of advertising or solicitation of purchases. (See Weinstein, *Commercial Appropriation, supra,* 52 L.A. Bar J. at pp. 430-433.) Furthermore, recent judicial construction of section 3344 has imposed an additional requirement. A "direct" connection must

---

[6]This is the correct characterization, in contrast to *Johnson* v. *Harcourt, Brace, Jovanovich* (1974) 43 Cal.App.3d 880, 894 [118 Cal.Rptr. 370], where the court stated that Civil Code section 3344, subdivision (a), "codifies" the law of appropriation of name and likeness for commercial purposes. The differences between the common law and statutory actions are: (1) Section 3344, subdivision (a) requires a *knowing* use whereas under case law, mistake and inadvertence are not a defense against commercial appropriation (see *Fairfield* v. *American Photocopy Equipment Co.* (1955) 138 Cal.App.2d 82, 87 [291 P.2d 194]); and (2) section 3344, subdivision (g) expressly provides that its remedies are cumulative and in addition to any provided for by law. (See Note, *Commercial Appropriation of an Individual's Name, Photograph or Likeness: A New Remedy For Californians* (1972) 3 Pac.L.J. 651, 659-661.)

be alleged between the use and the commercial purpose. (See *Johnson* v. *Harcourt, Brace, Jovanovich, Inc., supra,* 43 Cal.App.3d at p. 895.)

The *Johnson* court held that the use of a magazine article about plaintiff's finding a large sum of money in defendant's textbook was not "so directly connected with the sale" of the textbook that it fell within the purview of section 3344, subdivision (a). (*Ibid.*) The court reasoned: "The article must be viewed in the context in which it was republished. It was only used as an educational tool in an English textbook. It is obvious that the article was not a primary reason for the textbook; nor was it a substantial factor in the students' purchases of the book." (*Ibid.*; see Weinstein, *Commercial Appropriation, supra,* 52 L.A. Bar J. at p. 439.)

Here, Eastwood has alleged that the Enquirer employed his name, photograph and likeness on the front page of the subject publication and in related telecast advertisements, without his prior consent, for the purpose of promoting the sales of the Enquirer. Therefore, Eastwood states an actionable claim in his second cause of action under either the common law or section 3344, or both, if two conditions are satisfied: (1) Enquirer's use of Eastwood's name, photograph and likeness constitutes an appropriation for commercial purposes, and (2) Enquirer's conduct constitutes an impermissible infringement of Eastwood's right of publicity.

I

*Eastwood Has Stated Facts Showing an Appropriation of His Right of Publicity for Commercial Purposes*

Enquirer argues, citing *Fairfield* v. *American Photocopy Equipment Co., supra,* 138 Cal.App.2d 82 and *Williams* v. *Weisser* (1969) 273 Cal.App.2d 726 [78 Cal.Rptr. 542, 38 A.L.R.3d 761], that the failure of Eastwood to allege the appearance of an "indorsement" of the Enquirer is fatal to stating a cause of action for commercial appropriation.

California law has not imposed any requirement that the unauthorized use or publication of a person's name or picture be suggestive of an indorsement or association with the injured person. Enquirer's reliance on the *Fairfield* and *Williams* cases is therefore misplaced. These decisions merely hold that the exploitation of another's personality for commercial purposes constitutes an invasion of privacy. They did not purport to limit the scope of this tort. The exploitation in *Fairfield* took the form of advertising, which suggested a false indorsement by plaintiff. (138 Cal.App.2d at 87.) In *Williams,* the court found exploitation where a professor's lecture notes were sold without his permission. (273 Cal.App.2d at p. 742.) The case at bench involves a

different situation. This fact does not necessarily preclude a right of action here. As the court in *Kerby* v. *Hal Roach Studios* (1942) 53 Cal.App.2d 207, 210 [127 P. 2d 577] observed, "New sets of facts are continually arising to which accepted legal principles must be applied, and the novelty of the factual situation is not an unscalable barrier to such application of the law."

Moreover, the appearance of an "indorsement" is not the *sine qua non* of a claim for commercial appropriation. Thus, in *Stilson* v. *Reader's Digest Assn., Inc.* (1972) 28 Cal.App.3d 270 [104 Cal.Rptr. 581], the allegedly wrongful use involved a magazine's inclusion of individuals' names in letters soliciting participation in a sweepstake designed to promote subscription. The letters stated that the recipient and other named individuals had been chosen to receive "lucky numbers." No statement or implication that these individuals had consented to promote the magazine was made or implied. Assessing the legal significance of this promotional endeavor, the court stated that "[t]he unauthorized use of one's name for commercial exploitation is actionable." (*Id.*, at p. 273.)

Further, Enquirer contends that under *Lugosi* an appropriation of name and likeness for commercial purposes can be shown by Eastwood only if their use has impressed the Enquirer with a secondary meaning. We disagree.

In *Lugosi* v. *Universal Pictures,* which involved an action by the heirs of Bela Lugosi for commercial appropriation of his right of publicity, our Supreme Court held that the right of publicity, which is the legally protected interest a person has to control the commercial exploitation of his name, photograph or likeness, is not descendible and expires upon the death of the person so protected. (25 Cal.3d at pp. 819, 824; see *Guglielmi* v. *Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 861 [160 Cal.Rptr. 352, 603 P.2d 454].) Contrary to the Enquirer's position that the impression of a secondary meaning is a prerequisite to a claim for commercial appropriation, *Lugosi* recognized that the right of publicity includes not only the power to control the exploitation of one's personality through licensing agreements, but also the right to obtain relief, both injunctive and/or for damages, when a third party appropriates one's name and likeness for commercial purposes without permission. (25 Cal.3d at p. 819.)

Furthermore, to illustrate the import of *Lugosi,* we offer the following example: Henry Ford, during his lifetime, could have given a license to General Motors to use his name to endorse a "Buick" automobile. This would have constituted an assignment of his right of publicity. However, this assignment would have expired upon the death of Henry Ford and his

name would have been in the marketplace for anyone to use. (*Lugosi, supra,* 25 Cal.3d at pp. 822-823.) On the other hand, if Henry Ford had used his name as the name for a particular automobile so that his name acquired a secondary meaning, i.e., the use of the name "Ford" meant a particular automobile, it would be protectable as property under the law of unfair competition. (*Id.,* at p. 818.) Notwithstanding these contrasting uses, Henry Ford could elect not to exercise his right of publicity and "protect it from invasion by others by a suit for injunction and/or damages." (*Id.,* at p. 819.)

Moreover, apart from its inconsistency with the common law, Enquirer's suggested limitation of the scope of actionable commercial appropriation is at odds with the clear language of Civil Code section 3344. The statute imposes liability on a person "who knowingly uses another name, photograph, or likeness, *in any manner* . . . ." This broad language does not admit of the Enquirer's suggested limitation.

We therefore find that Enquirer's argument is without merit.

Turning to whether the Enquirer has commercially exploited Eastwood's name, photograph or likeness, we note that one of the primary purposes of advertising is to motivate a decision to purchase a particular product or service.

The first step toward selling a product or service is to attract the consumers' attention. Because of a celebrity's audience appeal, people respond almost automatically to a celebrity's name or picture. Here, the Enquirer used Eastwood's personality and fame on the cover of the subject publication and in related telecast advertisements. To the extent their use attracted the readers' attention, the Enquirer gained a commercial advantage. Furthermore, the Enquirer used Eastwood's personality in the context of an alleged news account, entitled "Clint Eastwood in Love Triangle with Tanya Tucker" to generate maximum curiosity and the necessary motivation to purchase the newspaper.

Moreover, the use of Eastwood's personality in the context of a news account, allegedly false but presented as true, provided the Enquirer with a ready-made "scoop"—a commercial advantage over its competitors which it would otherwise not have.

Absent a constitutional or statutory proscription, we find that Eastwood can show that such use is a subterfuge or coverup for commercial exploitation. (See Note, *"Right of Publicity" Tort Actions* (1977) 91 Harv.L.Rev. 208, 213.)

We therefore conclude that Eastwood has sufficiently alleged that the Enquirer has commercially exploited his name, photograph, and likeness under both the common law and section 3344, subdivision (a).

II

*Enquirer's Conduct May Constitute an Infringement of Eastwood's Right of Publicity*

 Enquirer argues that Eastwood's second cause of action fails to state an actionable claim under California law because the use of his name and photograph in the telecast advertisements, the cover page, and the story is expressly exempted from liability as a news account under the provisions of Civil Code section 3344, subdivision (d).

Civil Code section 3344, subdivision (d) provides inter alia that "[f]or purposes of this section, a use of a name, photograph or likeness in connection with any news . . . shall not constitute a use for purposes of advertising or solicitation."

While the issue raised by the Enquirer's argument solely involves the statutory remedy of Civil Code section 3344, subdivision (a), its resolution will necessarily determine Eastwood's ability to maintain a cause of action for commercial appropriation under the common law. The reason is that implicit in this issue are major constitutional questions which we must confront and determine. Publication of matters in the public interest, which rests on the right of the public to know, and the freedom of the press to tell it, cannot ordinarily be actionable. (See *Coverstone* v. *Davies* (1952) 38 Cal.2d 315, 323 [239 P.2d 876]; *Carlisle* v. *Fawcett Publications, Inc.* (1962) 201 Cal.App.2d 733, 745-746 [20 Cal.Rptr. 405]; *Stryker* v. *Republic Pictures Corp.* (1951) 108 Cal.App.2d 191, 194 [238 P.2d 670].)

In *Carlisle* v. *Fawcett Publications, Inc., supra,* the court defined "matters in the public interest" as follows: "The privilege of printing an account of happenings and of enlightening the public as to matters of interest is not restricted to current events; magazines and books, radio and television may legitimately inform and entertain the public with the reproduction of past events, travelogues and biographies." (201 Cal.App.2d at p. 746.)

Hence we are called upon to determine the boundaries of Eastwood's ability to control the commercial exploitation of his personality in the publication field. This determination will necessitate a weighing of the private interest of the right of publicity against matters of public interest calling for

constitutional protection, and a consideration of the character of these competing interests.[7]

■ Freedom of the press is constitutionally guaranteed, and the publication of daily news is an acceptable and necessary function in the life of the community. (*Gill* v. *Hearst Publishing Co.* (1953) 40 Cal.2d 224, 228 [253 P.2d 441]; *Carlisle* v. *Fawcett Publications, Inc., supra,* 201 Cal.App.2d at p. 746.) The scope of the privilege extends to almost all reporting of recent events even though it involves the publication of a purely private person's name or likeness. (See, e. g., *Coverstone* v. *Davis, supra,* 38 Cal.2d 315, 323; *Metter* v. *Los Angeles Examiner* (1939) 35 Cal.App.2d 304, 312 [95 P.2d 491].)

Moreover, "there is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities. Certainly, the accomplishments and way of life of those who have achieved a marked reputation or notoriety by appearing before the public such as actors . . . may legitimately be mentioned and discussed in print . . . ." (*Carlisle* v. *Fawcett Publications, Inc., supra,* 201 Cal.App.2d at p. 746.) Thus, a celebrity has relinquished " 'a part of his right of privacy to the extent that the public has a legitimate interest in his doings, affairs or character.' " (*Id.,* at p. 747.)

Yet absolute protection of the press in the case at bench requires a total sacrifice of the competing interest of Eastwood in controlling the commercial exploitation of his personality. Often considerable money, time and energy are needed to develop the ability in a person's name or likeness to attract attention and evoke a desired response in a particular consumer market. (See *Lugosi* v. *Universal Pictures, supra,* 25 Cal.3d at p. 824; Nimmer, *Right of Publicity* (1954) 19 Law & Contemp.Prob. 203, 216.) ■ Thus, a proper accommodation between these competing concerns must be defined, since "the rights guaranteed by the First Amendment do not require total abrogation of the right to privacy" (*Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 541 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]), and in the case at bench, the right of publicity (see, e.g.,

---

[7]The notion of balancing competing interests is not foreign to First Amendment controversies. See, e.g., with respect to subversive advocacy: *United States* v. *O'Brien* (1968) 391 U.S. 367, 376-377 [20 L.Ed.2d 672, 679-680, 88 S.Ct. 1673]; *Dennis* v. *United States* (1951) 341 U.S. 494, 503-505 [95 L.Ed. 1137, 1149-1150, 71 S.Ct. 857]. See, e.g., with respect to "fighting words": *Cohen* v. *California* (1971) 403 U.S. 15, 19 [29 L.Ed.2d 284, 290, 91 S.Ct. 1780]; *Feiner* v. *New York* (1951) 340 U.S. 315, 320-321 [95 L.Ed. 295, 300, 71 S.Ct. 303]. See, e.g., with respect to obscenity: *United States* v. *Reidel* (1971) 402 U.S. 351, 355-356 [28 L.Ed.2d 813, 817, 91 S.Ct. 1410]; *Roth* v. *United States* (1957) 354 U.S. 476, 481-483 [1 L.Ed.2d 1498, 1504-1506, 77 S.Ct. 1304].

*Zacchini* v. *Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562, 574-575 [53 L.Ed.2d 965, 975, 97 S.Ct. 2849].)

Ordinarily, only two branches of the law of privacy, namely, public disclosure and false light, create tension with the First Amendment, because of their intrusion on the dissemination of information to the public. (See, e. g., *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at p. 534; *Kapellas* v. *Kofman, supra,* 1 Cal.3d 20, 35-36; Prosser, Law of Torts, *supra,* § 118 at p. 827; Lehmann, *Triangulating the Limits on the Tort of Invasion of Privacy: The Development of the Remedy in Light of the Expansion of Constitutional Privilege* (1976) 3 Hastings Const.L.Q. 543, fn. 1.) Normally, in a commercial appropriation case involving the right of publicity, the only question is who gets to do the publishing, since the celebrity is primarily concerned with whether he gets the commercial benefit of such publication. (See, e.g., *Zacchini* v. *Scripps-Howard Broadcasting Co., supra,* 433 U.S. at p. 573 [53 L.Ed.2d at pp. 974-975].)

 All fiction is false in the literal sense that it is imagined rather than actual. However, works of fiction are constitutionally protected in the same manner as topical news stories. (See *Cohen* v. *California, supra,* 403 U.S. 15, 25 [29 L.Ed.2d 284, 293-294]; *Katzev* v. *County of Los Angeles* (1959) 52 Cal.2d 360, 365 [341 P.2d 310].)

Therefore, since Eastwood asserts that the alleged news account is entirely false, and is a coverup or subterfuge for commercial appropriation of his name and likeness, we must consider First Amendment limitations.

We have no doubt that the subject of the Enquirer article—the purported romantic involvements of Eastwood with other celebrities—is a matter of public concern, which would generally preclude the imposition of liability. (See, e. g., *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at pp. 535-536; *Carlisle* v. *Fawcett Publications, Inc., supra,* 201 Cal.App.2d at pp. 746-747.) However, Eastwood argues that the article, and thereby the related advertisements, are not entitled to either constitutional protection or exemption from liability as a news account because the article is a calculated falsehood.

 Since *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706, 84 S.Ct. 710, 95 A.L.R.2d 1412], it is clear that the First Amendment generally precludes the imposition of liability upon a publisher for its expressive activities, except upon a finding of fault. Thus, our analysis must determine whether Eastwood has alleged the kinds of fault and the appropriate standard that may constitutionally warrant lia-

bility in this case. (See Hill, *Defamation and Privacy Under the First Amendment* (1976) 76 Colum. L.Rev. 1205, 1254-1255.)

In actions where the fault involves defamatory statements, the cases have focused on the status of plaintiff to determine the standard of fault necessary to impose liability on a media defendant. For example, in the case of a public official or public figure, the Supreme Court established the rule that a plaintiff may not recover except upon showing that the defendant published defamatory statements with *actual malice* (hereafter scienter), i.e., either with knowledge of their falsity or with reckless disregard for the truth. (See *Curtis Publishing Co.* v. *Butts,* and its companion, *Associated Press* v. *Walker* (1967) 388 U.S. 130, 162 [18 L.Ed.2d 1094, 1115, 87 S.Ct. 1975]; *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706].[8] However, in defamation actions brought by private individuals, the Supreme Court has allowed any appropriate standard of fault less than scienter to be used, short of liability without fault. (See, e.g., *Time, Inc.* v. *Firestone* (1976) 424 U.S. 448 [47 L.Ed.2d 154, 96 S.Ct. 958]; *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 347 [41 L.Ed.2d 789, 809-810, 94 S.Ct. 2997].) Thus, a private-party plaintiff may sue for negligent publication of defamatory falsehoods. (*Gertz, supra,* at pp. 347-350 [41 L.Ed.2d at pp. 809-811].)

Similarly, in privacy actions involving deliberate fictionalization presented as truth, the cases have focused on the materials published to determine the standard of fault required to impose liability on a publisher. For example, where the materials published, although assertedly private and nondefamatory, are matters of public interest, the target of the publication must prove knowing or reckless falsehood. (See, e.g., *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469, 490 [43 L.Ed.2d 328, 346, 95 S.Ct. 1029]; *Cantrell* v. *Forest City Publishing Co.* (1974) 419 U.S. 245, 250-251 [42 L.Ed.2d 419, 425-426, 95 S.Ct. 465]; *Time, Inc.* v. *Hill* (1966) 385 U.S. 374, 387-388 [17 L.Ed.2d 456, 466-467, 87 S.Ct. 534].)

Moreover, the standard of scienter, whether in a defamation or privacy case, reflects the Supreme Court's recognition that while a calculated falsehood has no constitutional value, such statements are inevitable in the continuing debate on public issues and thus, the fruitful exercise of the freedoms of speech and press requires "breathing space" for speech that matters. (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at pp. 339-343 [41 L.Ed.2d at pp. 804-807]; *Time, Inc.* v. *Hill, supra,* 385 U.S. at pp. 387-

---

[8]Prosser criticized the use of the term "actual malice," and would substitute for it the word "scienter." (Prosser, Law of Torts, *supra,* § 118, p. 821.) We find this suggestion helpful, and shall use "scienter" in place of "actual malice."

391 [17 L.Ed.2d at pp. 466-469]; *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706].)

 Accordingly, we conclude whether the focus is on the status of Eastwood, or upon the materials published in the Enquirer article, scienter of the alleged calculated falsehood is the proper standard of fault to impose liability on the Enquirer, contrary to the position of Eastwood, that calculated falsehood alone is enough.

Enquirer contends, however, that it is the manifest character of the article which is determinative as to whether it is news under section 3344, subdivision (d). Enquirer argues that the statute, by its terms, refers only to generic categories; it does not distinguish between news accounts that are true or false. Thus, whether an article is a news account does not turn on the truth or falsity of its content. We disagree.

The spacious interest in an unfettered press is not without limitation. This privilege is subject to the qualification that it shall not be so exercised as to abuse the rights of individuals. Hence, in defamation cases, the concern is with defamatory lies masquerading as truth. (See, e.g., *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706].) Similarly, in privacy cases, the concern is with nondefamatory lies masquerading as truth. (See, e.g., *Time, Inc.* v. *Hill, supra,* 385 U.S. at pp. 390-391 [17 L.Ed.2d at pp. 468-469].) Accordingly, we do not believe that the Legislature intended to provide an exemption from liability for a knowing or reckless falsehood under the canopy of "news." We therefore hold that Civil Code section 3344, subdivision (d), as it pertains to news, does not provide an exemption for a knowing or reckless falsehood.[9]

Moreover, wherever the line in a particular situation is to be drawn between news accounts that are protected and those that are not, we are quite sure that the First Amendment does not immunize Enquirer when the entire article is allegedly false. (See, e. g., *Zacchini* v. *Scripps-Howard Broadcasting Co., supra,* 433 U.S. at pp. 574-575 [53 L.Ed.2d at p. 975].)

Finally, Enquirer contends that falsity is the predicate, not for commercial appropriation, but for false light claims. We disagree.

As noted earlier, all fiction is literally false, but enjoys constitutional protection.

---

[9]In *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d at page 540, footnote 14, in connection with "news," the court stated: "Judicial attempts at defining what constitutes 'news' are fraught with over-simplification. Thus news has been defined as the 'report of recent occurrences' [citation] or as all *factual* reports with 'that indefinable quality of interest, which attracts public attention.' [Citation.]" (Italics added.)

However, the deliberate fictionalization of Eastwood's personality constitutes commercial exploitation, and becomes actionable when it is presented to the reader as if true with the requisite scienter.[10] (See, e. g., *Spahn* v. *Julian Messner, Inc.* (1967) 21 N.Y.2d 124 [286 N.Y.S.2d 832, 233 N.E.2d 840, 30 A.L.R.3d 196]; Hill, *supra,* 76 Colum.L.Rev. at pp. 1306-1307.)

Here, Eastwood failed to incorporate from his first cause of action that the article was published with knowledge or in reckless disregard of its falsity. Accordingly, we find that such failure renders the second cause of action insufficient to make the Enquirer's expressive conduct actionable under the common law or Civil Code section 3344, subdivision (a).

Manifestly, such defect is capable of being cured by amendment. (See *Tate* v. *Superior Court* (1963) 213 Cal.App.2d 238, 251 [28 Cal.Rptr. 548].) Thus, where it appears that the trial court has made a ruling which deprives a party of the opportunity to plead his cause of action or defense, relief by mandamus may be appropriate to prevent a needless and expensive trial and reversal. (*Ibid.*)

Let a peremptory writ of mandamus issue requiring the respondent court to set aside its order sustaining the demurrer to Eastwood's second cause of action without leave to amend, and to grant Eastwood leave to amend his second cause of action.

Schauer, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied December 27, 1983, and the petition of real party in interest for a hearing by the Supreme Court was denied March 22, 1984.

---

[10]Although the issue is unsettled under California common law, we see no constitutional barrier to imposing damages under section 3344, subdivision (a) measured not only by the harm done to the plaintiff but additionally by the benefit enjoyed by defendant.